### THOMAS et al. v. HURST et al.

(Circuit Court, W. D. Missouri, W. D.    February 28, 1896.)

1. LIMITATIONS—ACCRUING OF CAUSE OF ACTION—PARTNERSHIP.

In fixing the date at which the statute of limitations begins to run against a cause of action for an accounting of the affairs of a partnership, and especially of a so-called mining partnership, a court of equity will not always take the date of the actual dissolution of the partnership by the death of a partner or otherwise, but in a case where, of necessity or by consent, the surviving partner continues the management of the partnership affairs for the winding up of the business, will sometimes postpone the running of the statute until such management or winding up has been completed, or until such surviving partner has openly asserted an adverse claim to the partnership assets.

2. SAME.

Prior to 1875 defendant, C., and A. were partners in mining operations; defendant being the active managing partner, and C. and A. residing in a state distant from the mines, and A. being ignorant of mining. The mines produced no profit, but defendant reported encouragingly to A. from time to time, and A. placed entire confidence in him. A. died in 1875, and defendant, shortly after, wrote to his widow that his interest in the mines was then of no value, but might become valuable, and defendant pledged his honor to account fully to the widow for anything that might be realized. Thereafter he never communicated with her, but continued to hold onto the firm property, to run and traffic in the same, and, at various times, admitted to other persons that A.'s widow had an interest therein. Prior to and in 1883, defendant sold out mining properties of the firm for large sums of money, for which he did not account to A.'s widow, who was ignorant of the sales until she learned of them

through a third party. Shortly after learning of such sales, and within the statutory period of limitation after the last one, A.'s widow brought suit against defendant for an accounting of the partnership affairs. *Held,* that the suit was not barred by laches, nor by the statute of limitations.

Geo. M. Wright and R. O. Boggess, for complainants.
C. O. Tichenor, for defendants.

PHILIPS, District Judge. This is a bill in equity for discovery and accounting between partners. On preliminary hearing on pleadings and proofs, the court found that one Charles H. Gage and the defendant Hurst in 1872 were partners in equal interest in all mines, mining operations, purchases, and sales had, owned, and engaged in by them jointly and severally, and likewise in any quartz mills owned by them, or in which they or either of them were interested, in the territory of Montana; that in 1872, or shortly thereafter, Alden Gage, the brother of said Charles, was, by mutual consent, evidenced by written correspondence between the parties, admitted into an equal share in the partnership; that this partnership extended to all such property rights and interests as pertained to the said Charles Gage and the defendant, existing in 1872, or subsequently acquired by them or either of them, and that said partnership affairs had never been settled or adjusted; and that the defendant Hurst, the survivor of the said Charles and Alden Gage, was in default, in failing and refusing, after demand, to render to complainant Isabella Thomas, the surviving wife of said Alden Gage, an accounting. A reference was thereupon made by the court to the master in chancery to take an accounting. The master having filed his report, finding in favor of the complainant in a given sum, she has filed various exceptions thereto, complaining principally of the inadequacy of the sum found in her favor by the master.

The defendant, without filing any exceptions to the report, resists on this hearing the rendition of any decree against him, on the principal ground that the cause of action stated in the bill is barred by the statute of limitation, and because the complainant has been guilty of laches in demanding an accounting. As this objection, if valid, is fatal, it must be disposed of, as of prime importance. On the first consideration of this case the court expressed the opinion that the defendant was clothed with an express, continuing trust, and therefore the statute of limitation did not apply. I am satisfied, on further consideration, that this statement is too broad. As applied to an ordinary business co-partnership, commonly known as a "mercantile or trading partnership," each partner is impressed with an implied trust, in dealing with the joint property and business of the concern; and, in case of dissolution of the partnership by the voluntary retirement or death of one or more of the co-partners, the cause of action for an accounting against the remaining partner is subject, in this state, to the five-years statute of limitation. But, even as to such a partnership, it does not necessarily follow that the statute of limitation begins to run from the instant of the retirement or death of one of the parties. It depends upon the peculiar facts and circumstances of each particular case. Such a partner-

ship is of so peculiar a character that its affairs, devolving upon the surviving partner for adjustment and settlement, may be in such condition at the time of the retirement of one of the partners that its practical continuance for a greater or lesser period may be a necessity acted on and recognized by all the parties in interest. So where, from the necessities of the situation, or the consensus, expressed or implied, of such persons in interest, the surviving partner continues to conduct the business, manage and administer its affairs, courts of equity, ex æquo et bono, hold that a cause of action may not, in the particular circumstances, arise, within the meaning of the statute, for an accounting, until the purpose of such recognized continued management and administration by the survivor has been accomplished, and equity will postpone the beginning of the running of the statute until that consummation. Massey v. Tingle, 29 Mo. 437; Coudrey v. Gilliam, 60 Mo. 86; Causler v. Wharton, 62 Ala. 358. So it is held in Riddle v. Whitehill, 135 U. S. 621, 10 Sup. Ct. 924, that where the affairs of a partnership are being wound up in due course, without antagonism between the parties, and assets are being realized and debts extinguished, and no settlement has been made between the partners, the statute of limitation has not begun to run, and that when the right of action accrues for an accounting, so as to put the statute of limitation in motion, "depends upon the circumstances of each case, and cannot be held, as matter of law, to arise at the date of the dissolution, or to be carried back by relation to that date." But the partnership under review is what is known in our Western mining states and territories as a "mining partnership." Its purpose and business were the acquisition, by purchase or exploration, of mineral lands, their development and operation. The defendant was a practical and actual miner, who undertook, especially for Alden Gage, the former husband of the complainant, who resided in the state of Ohio, to manage and conduct in person the mines in Montana. Such associations are, in many important respects, sui generis. The delectus personæ incident to an ordinary partnership has no place in mining associations. Hence such partnerships are not necessarily dissolved by the retirement of one of the partners, and a sale of his interest to a third party, even without the consent of the remaining partner. Nor is such partnership dissolved by the bankruptcy or death of one of the partners. Kahn v. Smelting Co., 102 U. S. 641; Bissell v. Foss, 114 U. S. 252, 5 Sup. Ct. 851; Skillman v. Lachman, 23 Cal. 198; Taylor v. Castle, 42 Cal. 367; Jones v. Clark, Id. 180; Blanch. & W. Lead. Cas. 129, 130. Mr. Justice Field, in Kahn v. Smelting Co., supra, said:

"Mining partnerships, as distinct associations, with different rights and liabilities attaching to their members from those attaching to members of ordinary trading partnerships, exist in all mining communities. Indeed, without them, successful mining would be attended with difficulties and embarrassments much greater than at present. * * * They form what is termed a 'mining partnership,' which is governed by many of the rules relating to ordinary partnerships, but also by some rules peculiar to itself, one of which is that one person may convey his interest in the mine and business without dissolving the partnership. * * * Associations for working mines

are generally composed of a greater number of persons than ordinary trading partnerships, and it was early seen that the continuous working of a mine, which is essential to its successful development, would be impossible, or at least attended with great difficulties, if an association was to be dissolved by the death or bankruptcy of one of its members, or the assignment of his interest. A different rule from that which governs the relations of members of a trading partnership to each other was therefore recognized as applicable to the relations to each other of members of a mining association. The delectus personæ which is essential to constitute an ordinary partnership has no place in these mining associations."

Courts of equity are never more efficacious nor zealous in the exercise of their preservative and protective powers than when they intervene to enforce the obligations springing from fiduciary relations, and in denying to the trustee any shelter for withholding trust property to the injury of the cestui que trust; and, when he undertakes to escape accountability by taking refuge behind the statute of limitation, these courts will not only construe such statutes most strongly against him, but where, by his silence when he should speak, or his acts, he has lulled into repose his unsuspecting beneficiary, or the circumstances of the particular case induce special reliance on the part of the beneficiary upon his fidelity, so as to impose upon him the honorable obligation of keeping his beneficiary informed of the true condition of the estate and his dealings therewith, his derelictions will, in the interest of exact justice, be held to amount to a fraudulent concealment. And to this end the courts will postpone the inception of the limitation period until he has, by some overt act, thrown off his allegiance, and the knowledge of his infidelity is conveyed to his cestui que trust. Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594; authorities, supra. A striking illustration of the application of this rule is presented in the case of Bacon v. Rives, 106 U. S. 99, 1 Sup. Ct. 3. The defendant had been furnished by the plaintiff, during the late Civil War, in 1863, with a large sum of Confederate money, to be invested by the defendant, in the state of Texas, in lands, or other supposed profitable ventures. Defendant's character inspired the utmost confidence in his integrity and fidelity. No report was had from him until 1865, when he reported simply large investments in cotton. After that he persistently remained silent. No tidings were had of his whereabouts. In 1875 it was discovered that he had long prior thereto returned to the state of Virginia, where he had invested probably a part of the proceeds of his speculations in real estate. Thereupon plaintiff filed against him a bill in equity of discovery and for an accounting. To this the defendant interposed the plea of statute of limitation, which, under the lex loci contractus, was two years on a verbal contract, and four years under written contract, and, under the lex fori, was five years. The court said:

"We are not satisfied that the cause of action, as set out in the bill, was, at the commencement of this suit, barred by limitation, as prescribed in either Texas or Virginia. The case, as now presented, discloses, not, perhaps, one of those technical trusts of which a court of equity has peculiar and exclusive jurisdiction, but yet a trust arising out of express agreement, under which the defendant received from complainant certain funds, which he undertook to invest in particular kinds of property, in conformity with specific instruc-

tions given by those whom he represented. His duty, under the law, although the agreement did not, in terms, so declare, was, from time to time, as the circumstances required, to inform those whom he represented of his acts, and, upon completion of the trust, to render an account of all he had done in the premises, or, if he elected not to execute the trust, to surrender the property or its proceeds. He received the funds in 1863 or 1864. * * * He gave no information whatever of his acts until the spring of 1865, when, in response to a letter from his principals, he wrote that he had invested the funds in the transportation of cotton, under articles of co-partnership to continue during the war, and that the business was under the management of an active partner, who gave his whole time and attention to it. * * * But he withheld the name of that partner, and did not inform his principals of the result of that investment. From that time forward the defendant failed to communicate with complainants, or any of them, as to what, if anything, had been accomplished in the execution of his trust."

The court then proceeds to say that the existence of the trust was clearly established.

"It is still open, or not wholly executed. It has never been disclaimed by clear and unequivocal acts or words brought to the notice or knowledge of complainants, or either of them. There has been no adverse holding of the original fund, or of its proceeds. Consequently the possession by the defendant of the proceeds of the original funds, if invested at all, may be deemed the possession of those whom he undertook to represent."

Further on the court says:

"Unless otherwise distinctly declared by the statute prescribing fixed periods for the commencement of suits, the cause of action is not ordinarily deemed to have accrued against, nor limitation to commence running in favor of, the trustee of such a trust as in the bill described, until the trust is closed, or until the trustee, with the knowledge of the cestuis que trustent, disavows the trust, and holds adversely to their claims."

Applying these wholesome doctrines to this case, what are the facts? The defendant Hurst for many years prior to 1872 resided in the territory of Montana, engaged in buying, working, and operating gold and silver mines. Charles Gage, brother of Alden Gage, married the defendant's sister. Prior to 1872 he and the defendant had been intimately associated together in business and mining operations in Montana. In 1872 they were partners in all mining claims. Prior to that time, when one was marshal in one of the counties, the other was his deputy. When the term of one ceased, the former deputy would become marshal, and the former marshal would become his deputy; and they shared, mutatis mutandis, in equal portion, the income of the office. Shortly prior to 1872 Charles Gage took up his residence in the state of Iowa. By personal interviews and correspondence, he induced Alden Gage, who knew nothing of practical mining, and had never been in Montana, to become interested in said mining operations. He extolled in unmeasured terms the virtue, integrity, and trustworthiness of Hurst to his brother, Alden. The result was the admission of Alden into a full partnership in all their mines and mining operations. From time to time, Alden was called upon to make advancements to this concern, until he had advanced about $2,000, under the supposition that Charles was advancing corresponding sums, but who in fact did not furnish but little over $300, which he borrowed from Alden, and does not seem to have ever repaid. Defendant received and used this money.

Up to the time of Alden's death in 1875, defendant wrote him from time to time, respecting the condition of the business, which experienced the usual fluctuations, disappointments, and hopes characteristic of such adventures; but, under the letters of defendant, there was sufficient encouragement to keep up hope and remittances. In one of these letters, in 1874, Hurst said:

"Am happy, for can see how that within year or two, with good management, am going to make money out of quartz, I think. Am not sorry now that you are interested with us, only that it may take longer than you expected. * * * Our mill is running every day on gold rock, and is keeping up the expenses developing the mines. We have got plenty of gold quartz, as well as silver, that does not look so bad at present, but it will take us 18 months to get them in shape to make money."

In a postscript he speaks of Charley having written him suggesting that papers be drawn up showing that Alden was interested "with us."

"You will find that I will do just as I agreed, if not a little better with you. Although you are a stranger to me, you have placed confidence in me, and I hope I will never give you cause to regret it. I may make a failure, but I never will betray that confidence by any dishonest act, and I cannot think Charley would."

In the last letter he wrote Alden, in March, 1875, after apologizing for not writing to Alden, answering his inquiries, he said:

"Think this summer will tell the tale for us, as we have got men working on four different lodes. They look well. Would not sell one inch, unless could get plenty of money for it."

In 1877 Charles died childless, leaving his wife surviving. On May 7, 1877, after the death of Charles, Hurst wrote to Mrs. Alden Gage, in which he said, inter alia:

"In relation to your interest in Cherry Creek Mine, at present will say they are almost worthless; but at one time we could have made money by selling them, and the time may come again. Should it come, and there is any money realized out of it, I will give you my sacred word you shall have every dollar of your share, which is equal with Charley's and mine. As regards my integrity, outside of politics, I would refer you to Hon. W. F. Sanders, in Helena; Hon. Henry L. Blake, associate justice of Montana; P. A. Largey, C. L. Dahler, bankers; or any other business men in the territory."

From that time on to the institution of this suit, he gave her no information and made no report of his stewardship; but he held on to the property,—run and trafficked in the same. The master finds that among the partnership mines, under the partnership, were the Broadway, Ajax, and Red Bluff Mines and Mill; and Hurst admits in his letter that the Cherry Creek Mine was also among the partnership property. It is quite evident, from all the evidence in this case, that, at the time of the death of Alden and of Charles Gage, these mining properties were either in process of development, or that Hurst was preparing for their development and operation. He began active work on the Broadway Mine, developing the interest he and Charles had therein, in 1877. The property was in a condition in which it could not be abandoned, and it would have been destructive to the interests of all parties to have done so. He never denied the interest of his sister, as the widow of Charles Gage, in the Broadway Mine, for the evidence shows that he paid her large

dividends therefrom as late as 1880. Repeatedly, during the time he ran it, he admitted that Alden Gage was interested in the property; and the same Hon. W. F. Sanders mentioned by him in his letter to Mrs. Alden Gage testified in his deposition that as late as 1880, or perhaps 1881, the defendant proposed to send by him, to Mrs. Alden Gage, the sum of about $3,000, on account of dividends in this Broadway Mine. This, however, the defendant denies, in a qualified way, by saying that it was only the sum of $300 which he proposed to send her, as a mere charity. In 1881, meeting with an opportunity to sell out the partnership interest in this mine, he obtained from the widow of Charles a quitclaim deed for her interest, for which he paid her $1,000, and in August of that year he sold the partnership interest, realizing therefrom $15,000. In the following fall, or in 1882, he came to Kansas City, and bought a home with part of this money, and speculated with the balance, as he claims, and lost thereon. As late as November or December, 1883, he returned to Montana, and sold the Red Bluff property, which was the Red Bluff Mines and Mill, found by the master to belong to this partnership. So it appears that as late as November or December, 1883, within five years of the institution of this suit, he was engaged in looking after and closing out the partnership property. But he was as silent as the grave, so far as Alden's widow was concerned, as to these important sales. By his said letter to her in May, 1877, he gave her to understand, in effect, that the partnership interest was subsisting and continuing under his guardianship and watchful eye; and its effect was to persuade her to remain in hopeful inaction, relying upon the pledge of his "sacred honor" that in the end of his stewardship he would account for every dollar. But he concealed from her his sales of the Broadway and Red Bluff Mines and Mill, aggregating about $20,000, and even the fact of his removal to Missouri. Not until a short time before the institution of this suit did Mrs. Gage learn, on a chance meeting with that same Hon. W. F. Sanders, of the sale of this property. And, when she did call him to account, he denied even the existence of the partnership in this property, and refused to render any account for a single dollar. Under such circumstances and facts, the plaintiff has not been guilty of inexcusable laches, and the defendant is not sheltered by the statute of limitation. Equity protests against such defense.

In respect of the suggestion of defendant's counsel that the master ought to have accepted, nem. con., the testimony of the defendant to the effect that in a private interview had with Alden Gage, in Utah, shortly before his death, Alden gave him to understand that he abandoned to him (Hurst) his interest in said partnership, it is sufficient to say that defendant has filed no exceptions to the master's findings. And, even if this were an open question, the defendant is. contradicted as to the probability of any such statement by his own letter to Mrs. Gage in May, 1877, in which he recognized her interest in certain partnership property, and promised her, if anything came therefrom, to account for it. If this were a suit between Alden Gage's administrator and the defendant, he would have been incompetent as a witness to such interview. And where he comes

to withhold the property of the dead man, from his widow, whose voice is hushed forever in the grave, the master is well justified, in view of all the facts and circumstances of this case, in discrediting that statement.

In respect of the exceptions taken by the complainant to the master's report, I am frank to say that he has dealt most liberally with the defendant, in allowing him credits for expenditures claimed by him to have been made in and about the partnership property,— especially in respect of certain credits allowed the defendant on account of purchases and work done prior to the admission of Alden Gage into the co-partnership. There is much reason in the contention of complainant's counsel that Alden was admitted into a one-third interest in the property as it stood at the time of his admission. But in view of the indefiniteness of much of the testimony, and the complications in the state of the accounts after so long a lapse of time, the master has, perhaps, on the whole, reached a conservative conclusion.

The master has not allowed any interest on the final sum found in favor of complainant. The justice of this conclusion is not apparent to the court. Interest is a compensation for the use of money wrongfully detained. It is customary for all courts to allow interest on the final sum found to be due on an accounting. And while it is to be conceded that a court of equity, in such case as this, would be justified in awarding interest on the balance found due to the complainant from the time when it should have been accounted for, certainly the complainant should be allowed interest on this sum from the date of demand of payment made of the defendant for an accounting. The statute of this state (Rev. St. § 5972) declares that creditors shall be allowed interest at the rate of 6 per centum per annum "for all moneys after they become due and payable on written contracts, and on accounts after they become due and demand of payment is made." As this is a demand on account not in writing, the interest should be computed from the date of demand. It appears that such demand was made some time before the institution of suit. In the absence of a more exact date furnished by the evidence, interest should be computed on the sum found by the master from the 9th day of July, 1888,—the date of filing the petition. Decree accordingly.